[Civ. No. 30469. Fourth Dist., Div. Three. June 29, 1984.]

KENNETH I. BATTRAM et al.,
Plaintiffs, Cross-defendants and Respondents, v.
EMERALD BAY COMMUNITY ASSOCIATION,
Defendant, Cross-complainant and Respondent;
EMERALD BAY CC&R COMMITTEE, Defendant and Appellant.

COUNSEL

Call, Clayton & Jensen, Call & Clayton and Wayne W. Call for Defendant and Appellant.

Mirassou & Nyznyk and J. B. Mirassou for Plaintiffs, Cross-defendants and Respondents.

Goebel & Monaghan and Louis E. Goebel for Defendant, Cross-complainant and Respondent.

OPINION

SONENSHINE, J.—The facts are not in dispute. Emerald Bay is a private self-contained community of over 500 homes. There are 11 tracts in the community, subject to virtually identical covenants, conditions and restrictions (CC&Rs). The Emerald Bay Community Association (Association) administers the rights and obligations created by all the CC&Rs and establishes a fiscal year budget, funded by imposing homeowner fees against the properties.

The CC&Rs prescribe these fees as a percentage of the assessed value of each property. Article XI of the CC&Rs requires assessed values be determined by the Orange County Assessor's office. Prior to 1978, this office

defined "assessed value" as 25 percent of each property's full cash value. Following adoption of Proposition 13 (Cal. Const., art. XIII A § 1) "assessed value" became the "full cash value" shown on the 1975-1976 tax bill *or* appraised value following a change of ownership or in the event of new construction.

After 1978, in determining homeowner association dues, the board of directors continued to rely on the tax rolls provided by the assessor's office. Thus, Emerald Bay residents purchasing or constructing a home after passage of Proposition 13 were subject to a considerably higher proportion of the total homeowner fees than those who owned homes of comparable value but purchased them prior to its passage. The number of new homeowners in Emerald Bay gradually increased and eventually represented a preponderance of members of the board of directors.

The Battrams, new property owners, filed an action for declaratory relief against the Association, contending the "assessed value" terminology of the CC&Rs could no longer be determined by the county's records but must be based on current fair market value. The Association cross-complained, alleging it had made a good faith attempt to abide by the CC&Rs. It argued it was circulating an amendment to change the assessment method by establishing a "flat rate" basis for allocating the homeowner fees.[1] The Association requested the court to declare the procedure for assessing homeowner fees could be amended by 75 percent of the owners. This request was necessitated by the conflicting language of article XI (appearing to forbid *any* change in the basis for assessing fees without consent of 100 percent of the homeowners) and article XII (allowing cancellation of any part of the CC&Rs by 75 percent of the homeowners).

An answer to the original complaint was filed by the Emerald Bay CC&R Committee (Committee), a group of pre-Proposition 13 owners, appearing as Doe defendants. The committee argued a change in fee assessment procedures could be made only by a 100 percent vote of the residents and not by court construction of the CC&Rs or by amendment.

All parties moved for summary judgment and stipulated the court could determine the matter on the merits based on the pleadings and a "Stipulation of Uncontested Facts." The trial court granted the Battrams' motion for summary judgment, finding the term "then assessed value" as contained in the CC&Rs "was intended to and does mean assessed value based upon the then fair market value of the individual properties, and does not and cannot

---

[1]The modification plan is presently implemented and the Association asserts "the financial affairs of the community have been satisfactorily managed."

be fairly interpreted to mean the post-Proposition 13 values maintained by the Orange County Assessor. . . . [and the Association] must use values which are arrived at in the manner utilized by the Orange County Assessor prior to Proposition 13, to wit, values based on the fair market value of each individual property at the time." In accord with the relief sought by the Association, the court further found "the provisions of Article XII relating to amendment prevail over the provisions of Article XI . . . ."

The Committee appeals.[2]

## I

We must determine whether a 100 percent or only 75 percent vote of the homeowners is required to modify the assessment procedures of the CC&Rs. The Committee contends article XI[3] must be read literally—"said fees and charges shall always be levied at a stated percentage of the assessed value of the respective lot, . . ." But we agree with Battram and the Association who are concerned with a long term solution satisfactory to the greatest number of property owners; they urge us to consider the ambiguity inherent in articles XI and XII[4] and resolve the conflict by permitting the same percentage which may annul the CC&Rs to amend them.

---

[2]The Committee also contends the Battrams' requested relief is barred by waiver, estoppel and laches. The lower court made no mention of these defenses. They were not argued or raised at any of the three hearings and no request was made to the trial court for their determination subsequent to the written decision.

[3]Article XI provides in pertinent part: "Any and all of the conditions and/or restrictions and/or charges contained in this Declaration may be annulled, waived, changed or modified, . . . with the written consent of the Association and of the owner or owners of record of more than one-half (½) of the lots and parcels of said property . . . [if] the said Association shall first have had a public hearing thereon; PROVIDED, HOWEVER, that no such change or amendment or modification of or addition to the conditions and/or restrictions and/or charges contained in this Declaration shall ever be made as will change the basis for the determination of the charges and/or fees levied and/or charged by the Association pursuant to Paragraph (11) of Article VIII hereof—that is to say, said fees and charges shall always be levied at a stated percentage of the then assessed value of the respective lot, parcel or building site, and all improvements thereon, with reference to which such charge or fee is levied, as established by the Assessor of the County of Orange, State of California, and in levying any and every such charge or fee, the same rate or percentage shall be applied against the assessed value of each and every lot, parcel or building site in said property, and the improvements thereon."

[4]Article XII provides in pertinent part: "Restrictions May be Cancelled after 1959. At anytime after the first day of January 1959, the owners of record of lots or building sites in the property then subject to this Declaration having an aggregate area equivalent to not less than sixty-five per cent (65%) of the total area of said property therein described, and who shall include in their number the owners of record of not less than seventy-five per cent (75%) in area of the building sites therein described on which dwelling houses or other principal structures are then located, may cancel and annul, with respect to said property therein described, all or any of the conditions, restrictions and charges contained in this Declaration, excepting the prohibitions of Paragraph 2 of Article II hereof, by an instrument in writing, signed by said owners, which shall be acknowledged by them so as to entitle it to record and be recorded in the office of the County Recorder of Orange County."

All parties agree the advent of Proposition 13 has seriously impacted the homeowner assessment methods mandated by the CC&Rs. Their paths diverge on the issue of whether, and in what manner, the methods may be altered by the Association. ■ Where "the interpretation of [the CC&Rs] does *not* turn upon the credibility of extrinsic evidence, the appellate court must make an independent determination of [their] meaning . . . ." (*Stadium Concessions, Inc.* v. *City of Los Angeles* (1976) 60 Cal.App.3d 215, 218 [131 Cal.Rptr. 442].) The CC&Rs, enacted for the mutual benefit of all Emerald Bay homeowners, are "to be interpreted so as to give effect to the main purpose of the contract . . . [and] where a contract is susceptible of two interpretations, the courts shall give it such a construction as will make it lawful, operative, definite, reasonable and capable of being carried into effect [Civ. Code, § 1643] . . . [and] avoid an interpretation which will make [the CC&Rs] extraordinary, harsh, unjust, inequitable or which would result in absurdity." (*Howe* v. *American Baptist Homes of the West, Inc.* (1980) 112 Cal.App.3d 622, 626-627 [169 Cal.Rptr. 418].)

■ A literal reading of article XI would prohibit any change in the basis of the homeowner fee assessment without unanimous consent of the homeowners. Article XII, on the other hand, allows all or any part of the CC&Rs to be cancelled or annulled by 75 percent of the property owners. This inconsistency permits 75 percent of the homeowners to *dissolve* the entire CC&Rs but not to *alter* a provision in one of its articles; a single homeowner would wield more power over assessment procedures than the aggregate of his/her fellow residents. We find this untenable. We are convinced, as was the trial court, the inconsistency must be resolved by holding the assessment procedure may be amended by 75 percent of the owners.[5] "[A] contrary interpretation would lead to an intolerably harsh, unjust and inequitable result, all in violation of well established principles relating to interpretation of contracts." (*County of Marin* v. *Assessment Appeals Bd.* (1976) 64 Cal.App.3d 319, 328 [134 Cal.Rptr. 349].)

Our holding is reinforced through consideration of the intent of the CC&R drafters. They envisioned the homeowners funding their association needs from payments based on the value of each home. But that intent has been seriously undermined by subsequent events, and the language of article XI, forbidding a change in the basis for those fees, must succumb.[6]

---

[5]This figure varies from tract to tract and the appropriate percentage should be applied in each instance.

[6]For the vast majority of Emerald Bay homeowners, the issue of proper construction of the term "assessed value" (art. XI) is moot. They may by requisite vote choose any legal and equitable method they prefer for assessing their homeowner fees. To the extent article XII is not yet operable (the briefs allude to one tract which may not rely on its counterpart of article XII until 1986-7), we uphold the trial court's judgment, "as to the [CC&Rs] of Emerald Bay, . . . the term, 'then assessed value' . . . was intended to and does mean

Prior to 1978, each home's value was taken from the assessed values recorded by the Orange County Assessor's office. The process was simple, logical and relatively cost-free to the Association. In 1978, assessed value in essence became 100 percent of the full cash value. If this were the extent of the change, there would be no dispute. The original intent—equal distribution of fees based on value—would be undisturbed. The basic problem was inclusion of a new element in the equation determining homeowner fees—time of purchase. Unforeseen by the framers and, we believe, in derogation of their intent, two classes of property owners emerged—those indefinitely paying homeowner fees based on 1975 full cash value and those later purchasing or constructing a home of equal value paying homeowner fees based on "acquisition value," despite the escalation in cash value since 1975.

The time factor, inherent in the formula for determining fees, disintegrated due to forces unrelated to the Emerald Bay property owners themselves or to the reasons for originally adopting the CC&Rs. Article XI's proscription against change is no longer relevant.[7] "Words in a contract which are wholly inconsistent with its nature, or with the main intention of the parties, are to be rejected." (Civ. Code, § 1653.)

We have no doubt had the assessor's office ceased to make *any* appraisals or assessments, an independent method would have quickly been adopted. If concurrence of 100 percent of the owners were necessary to so "amend" article XI, new builders could prevent *any* homeowner fee assessment on their properties. We find this eventuality also unforeseen and undesired by the framers.

As noted by the court below, "Proposition 13 has indeed put society on notice that major changes [such as virtual elimination of the long accepted meaning of assessment value] may well be anticipated in many areas of the law in the future, and in light of future uncertainties, some of which may well bear upon the assessment practices of the Emerald Bay Community

---

assessed value based upon the then fair market value . . . ." This interpretation most satisfies the original intent of the CC&R drafters; the value of the property determines the amount of each owner's share of the community's budget.

We note the recent decision in *Amberg* v. *Rolling Hills Community Assn.* (1984) 150 Cal.App.3d 1125 [198 Cal.Rptr. 311] and find it unpersuasive.

[7]We stress the difference between assessment for *state* real property tax purposes as opposed to assessment for *private* community homeowner fees. Whether prior or subsequent to Proposition 13, real property taxes are imposed statewide and the revenue realized benefits the general public without regard to the particular properties taxed. Homeowner fees, on the other hand, are special assessments, affecting only the self-governed community they *directly* benefit. The drafters had no reason to and we feel in fact did not consider the electorate would require the Orange County Assessor not only to redefine "assessment value" but to determine that value on widely divergent dates.

Association, . . . the 100% requirement for assessment changes can[not] stand in light of its conflict with the language of Article 12."

The judgment is affirmed. The Battrams and the Association to receive their costs on appeal.

Trotter, P. J., and Wallin, J., concurred.

A petition for a rehearing was denied July 18, 1984, and appellant's petition for a hearing by the Supreme Court was denied September 20, 1984. Mosk, J., and Kaus, J., were of the opinion that the petition should be granted.